## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

ROSE STENDER                                             PLAINTIFF

V.                          No. 4:22-CV-592-LPR-JTR

RELIANCE STANDARD LIFE INSURANCE
COMPANY and ARKANSAS PSYCHIATRY &
BEHAVIORAL HEALTH, P.A.                         DEFENDANTS


## RECOMMENDED DISPOSITION

The following Recommended Disposition has been sent to United States District Judge Lee P. Rudofsky. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Rudofsky may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I.    INTRODUCTION

On June 27, 2022, Plaintiff Rose Stender ("Stender") initiated this ERISA action[1] against her employer, Arkansas Psychiatry and Behavioral Health ("APBH"), and its plan administrator, Reliance Standard Life Insurance Company ("Reliance").[2] In her Complaint (*Doc. 1*), she challenges Reliance's final decision denying her claim for short-term disability benefits.

On November 30, 2022, Stender filed a Motion for Entry of Judgment on the Pleadings, and a Brief in Support. *Docs. 14 and 15.* On December 20, 2022, Reliance filed a Response to Stender's Motion and a Cross-Motion for Judgment on the Administrative Record, along with a Brief in Support. *Docs. 16 and 17.* On January 10, 2023, Stender filed a Reply and Response to Reliance's Cross-Motion. *Doc. 20.* Both of these now fully joined Cross-Motions rely on the parties' stipulated record of the administrative proceeding. *Doc. 13.*

---

[1] The Employee Retirement Income Security Act of 1974 ("ERISA") is codified at 29 U.S.C. § 1001 *et seq.* Stender brings her claims under § 502(a), (e)(1) and (f) and seeks relief pursuant to 29 U.S.C. § 1132(a), (e)(1), and (f). *Doc. 1 at 1.*

[2] Effective February 1, 2011, APBH became a "Participating Unit" in the "RSL Group and Blanket Insurance Trust." Reliance is the plan administrator for the Trust Agreement. *Doc. 13-1 at 2.*

## II.    BACKGROUND

### A. Medical Evidence Relevant to Stender's Short-Term Disability Claim

Stender began working as a Licensed Practical Nurse for APBH in 1998. Her job required her to provide administrative assistance to physicians. *Doc. 13-1 at 229*.

On July 9, 2021, Stender saw her primary care physician, Dr. Michael Beard, for "Follow-up (labs) and Medication Refill." *Doc. 13-1 at 211*. At the time of this appointment, she was 58 years old and had a BMI of 31.28, which classified her as obese or significantly overweight. *Id. at 213*. According to Dr. Beard's notes, she was taking the following medications: (1) Concerta for ADD; (2) Montelukast for asthma; (3) Tizanidine, a muscle relaxer; (4) Amlopidine for high blood pressure; (5) Fluoxetine for depression; and (6) Eszopiclone (Lunesta) for insomnia. *Id. at 211-212*. On July 15, 2021, Dr. Beard made a note that Stender was starting Pravachol, a statin drug that reduces cholesterol and lessens the risk of stroke and heart attack. *Id. at 216*.

Dr. Beard's July 9 notes reflect that Stender's blood pressure was 126/76, which was within normal range. *Id. at 213*. Her noted past medical history indicates that, on November 5, 2020, she was diagnosed with diastolic heart failure (the thickening of the left ventricle muscle) and systolic heart failure (a weakening of the

left ventricle of the lower heart which can reduce the ejection fraction). *Id. at 211*.[3]

Dr. Beard had a blood sample drawn and ordered a Basic Metabolic Panel ("BMP").

The reported results of the BMP were well within normal limits. *Id. at 214*. Dr. Beard

noted that, "in 1 year," Stender should return for a blood test to "Recheck BNP [a

hormone in the bloodstream that is monitored to evaluate the volume of blood the

heart is pumping] . . . and [administer a] BMP." *Id. at 215*. Dr. Beard's decision to

wait *one year* before checking Stender's BNP and performing another BMP suggests

her diastolic and systolic heart failure was stable.

Finally, in his "Review of Systems," Dr. Beard noted that Stender was

"negative for chest pain, palpitations, and leg swelling." Neurologically she was

positive for headaches but negative for light-headedness." *Id. at 212*.[4]

After work on August 3, 2021, Stender went to the ER and reported "fatigue,

body aches, headaches, chills, nausea, and intermittent shortness of breath." *Doc.

13-2 at 3*. Her examination was described as "unremarkable," and all test results

were deemed "nondiagnostic." *Id.*

---

[3] The Pravachol, generically named pravastatin, Dr. Beard prescribed for Stender on July 15 is a statin, which is sometimes prescribed for diastolic and systolic heart failure. Tehrani, et al. *Statin Therapy in Patients with Diastolic Heart Failure*, 33 CLIN. CARDIOL., Apr. 2010 at E1–E5, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6653295/pdf/CLC-33-E1.pdf

[4] Stender's July 9, 2021 medical records are important because they provide a detailed picture of her overall health *only three weeks before* her visit to the Baptist Health emergency room in Little Rock (hereinafter "ER") on August 3, 2021, the day before she stopped working on August 4, 2021.

Because she complained of "palpitations," ER physicians ordered both a CT scan of her heart, with IV contrast, and an ECG. The CT scan was negative for "pulmonary embolism, heart blockage or pulmonary filling defects." *Doc. 13-1 at 175*. This imaging showed only that Stender had "mild cardiomegaly" and "coronary artery calcifications," with no "pericardial effusion" or signs of "aortic aneurysm." *Id. at 176*.

The ECG showed "normal sinus rhythm" but a "right bundle branch block," which was an "abnormal result." *Doc. 13-1 at 182*.[5] This ECG abnormality, however, did not raise any concerns, and she was discharged, after those test results were reviewed, and allowed to go home. *Doc. 13-2 at 3*.

Her discharge instructions stated she should follow up with her primary care physician if her symptoms worsened and return to the ER with any new or worsening symptoms. *Id.* Her diagnosis was a "possible UTI," or viral infection. *Id.* She was prescribed an antibiotic (doxycycline) for the UTI; benzonatate for symptomatic relief of her cough; albuterol for her asthma; and acetaminophen for her headache. *Id*. While "body aches" were one of Stender's complaints when she "presented to

---

[5] On August 4, 2021, Dr. David Jones, a cardiology specialist, read and confirmed the results of the ECG. *Doc. 13-1 at 182*. As will be discussed later, Stender followed up with her own cardiologist, Dr. Faheemullah Beg, on September 21, 2021, and, after administering a stress test, which was "normal" with "no ischemia," she noted that Stender reported "significant improvement in her symptoms especially dyspnea and palpitations" and had engaged in "more physical activity in the last 1 month." *Doc. 13-3 at 30 and 36*.

the ER,"[6] the medical notes do *not* reflect her making *any complaints about joint pain*, acute or otherwise, in her neck, back, or elsewhere.

The next day, August 4, 2021, Stender took sick leave which she remained on through September 15, when it expired. *Doc. 13-1 at 138.* Thereafter, Stender never worked again, and August 3 was her last day in the office with APBH.

On August 23, 2021, twenty days after stopping work, Stender saw Michael Martinez, a chiropractor in Conway, for "multiple complaints of neck and shoulders, low back and leg pain." *Doc. 13-2 at 18*. She reported "subjective" pain of "9 on a 10 scale," in her "neck, midback, lower back, hip, right leg, left leg, and left shoulder." *Id.*[7]  Dr. Martinez ordered x-rays of Stender's cervical, thoracic, and lumbar spine. Those x-rays revealed "vertebral segmental dysfunctions," with mild scoliosis, disc space irregularities, and spurring. *Id. at 18-22*. After physical manipulation, electric stimulation, acupuncture, and hot packs, Dr. Martinez noted Stender "improved from treatment/tolerated treatment well." *Id. at 19*. He also found *her range of motion was "within normal limits*." *Id. at 18*. Dr. Martinez's diagnosis

---

[6] Her other complaints were "fatigue, headache, chills and nausea for the past several days" (*Doc. 13-2 at 3*) and "palpitations" *(Doc. 13-1 at 182*). ER medical providers construed her complaints of "body aches" as "muscle pain." *Doc. 13-1 at 173 and 183*.

[7] Nine on a 10-scale of pain is defined as excruciating pain that may cause a person to moan or cry out, and may prevent them from carrying on a conversation. Pain Assessment IN Advanced Dementia PAINAD Tool, HEALTH CENTRIC ADVISORS, https://healthcentricadvisors.org/wp-content/uploads/2019/11/fall19_PainMedication_Cards_LL_UpdatedIPRO.pdf

was "segmental and somatic dysfunction" in the cervical, thoracic, lumbar, sacral and pelvic regions, along with minor spasm and right arm pain. *Id. at 21-22.*[8]

On August 24, 2021, Stender saw Dr. Beard. *Doc. 13-2 at 185.* He noted Stender's August 3 visit to the ER "with viral symptoms." *Id.* She told Dr. Beard she was "weak and [having] neck and back pain." *Id.* She also told him that Dr. Martinez believed she has ankylosing spondylosis.[9] *Id.* When Dr. Beard used a stethoscope to listen to her heart, he noted: "Heart: Regular rate and rhythm. S1 S2 audible. No rubs, murmurs, or gallops." *Id. at 187.*

In his "Review of Systems," he found Stender had positive back and neck pain and neurological weakness but was *not* in any "acute distress." [10] *Id.* In his "Assessment/Plan," Dr. Beard stated Stender has "spondylosis."[11] *Id.* Finally, Dr.

---

[8] "Segmental dysfunction" is a term used by chiropractors "to describe what happens when one of the vertebrae in the spine is not moving correctly or is malpositioned." https://www.justchiro.net. "Somatic dysfunction" is used by chiropractors to describe a vertebral unit possessing any of the following palpatory characteristics: tissue texture changes, asymmetry of motion and relative position, restriction of motion, or tenderness. https://pubmed.ncbi.nlm.nih.gov.

[9] Ankylosing spondylosis is a type of arthritis that effects the spine. Symptoms typically develop gradually, before age 45, and last more than three months. *See Mayoclinic.org.* Nothing in Dr. Martinez diagnosis mentions "ankylosing spondylosis," but Dr. Beard's notes state that Stender told him that is what Dr. Martinez believed was causing her back pain.

[10] Stender being in no acute distress on August 24 is perplexing since she told Dr. Martinez, *the previous day*, that the pain in her neck, back, hip, legs, and shoulder was a 9 on a 10 scale.

[11] Osteoarthritis that affects the spine is known as spondylosis. It is a degenerative condition that, over time, can cause loss of normal spine structure and function. 4 Attorneys Textbook of Medicine (Third Edition) § 10A.03 (2023) ("Degenerative changes in ligaments, joints and vertebrae occur with age and are known as osteoarthritis, hypertrophic or degenerative arthritis or degenerative spondylosis").

Beard ordered an ANA screen of Stender's blood to determine if she had any autoimmune diseases such as rheumatoid arthritis, or connective tissue disease, and recommended that she "continue chiropractic treatments." *Id. at 188*.[12]

Later on August 24, 2021, Stender had an appointment with Dr. Martinez. *Doc. 13-2 at 23.* He noted that Stender was "slightly improved" and now reported pain in her "neck, midback, lower back, hip, left and right leg and left shoulder" that was a "7 or 8 on a 10 scale."[13] *Id*.

On September 13, 2021, Stender filed her "Proof of Loss Claim Statement Short Term Disability" (hereinafter "Proof of Loss Statement") with Reliance. *Doc. 13-1 at 138.* She selected August 4, 2021, as the "first day [she was] unable to work." *Id*. Her stated reason for being "unable to work" was "Weakness tingling in extremities/SOB [shortness of breath]/CP [chest pain] with heart racing/Brain fog."

---

[12] On August 26, 2021, Dr. Beard reviewed the results of the ANA screen, which was *negative* for any autoimmune disease. As a result, he concluded that Stender is "[u]nlikely to have a Connective Tissue Disease (including Ankylosing Spondylosis)." *Id. at 190.*

[13] Seven on a 10-scale of pain is "very strong pain . . . that significantly limits your ability to perform normal daily activities." Eight on a 10-scale of pain is "intense pain" that "severely limits" physical activity. Pain Assessment IN Advanced Dementia PAINAD Tool, HEALTH CENTRIC ADVISORS, https://healthcentricadvisors.org/wp-content/uploads/2019/11/fall19_Pain Medication_Cards_LL_UpdatedIPRO.pdf

Once again, it is perplexing that Stender was in "no acute distress" when she saw Dr. Beard on August 24, but, *later the same day*, told Dr. Martinez she was in severe or intense pain over large areas of her body.

*Id.*[14] Stender mentioned *nothing* about spondylosis contributing to her being "unable to work."[15]

On September 18, 2021, Dr. Beard completed and submitted a form captioned "Attending Physician's Statement." *Doc. 13-1 at 144*. Dr. Beard filled in blanks and checked boxes reflecting that Stender's "Diagnosis and Concurrent Conditions" are "Lumbar Spondylosis" and "Cervical Spondylosis," which "first appeared" on "8/3/21," the date Stender was seen in the ER in Little Rock.[16] *Id.* Based on her "lumbar and cervical spondylosis," Dr. Beard stated that Stender was "continuously unable" to perform her job from "prior to [the] event [without identifying "the event"] to 8/4/21."[17] *Id.* He estimated Stender "should be able to return to work" on "2/3/21."[18] *Id.* Suffice it to say, the dates Dr. Beard provided in this document are both contradictory and nonsensical. However, Dr. Beard is very clear that: *"lumbar*

---

[14] When Stender saw Dr. Beard on August 24, she reported only "feeling weak and neck and back pain." She voiced no complaints about "tingling in extremities/SOB/CP" or "[b]rain fog." *Doc. 13-2 at 185*.

[15] According to Stender's August 3 ER records, she reported palpitations, which might correlate with "heart racing;" however, at that time, she did not mention anything about having "[w]eakness[,] tingling in extremities/SOB/CP [or] [b]rain fog."

[16] As previously noted, nothing in the August 3, 2021 ER records reflect that Stender complained about joint pain in her neck or back. Rather, she only complained about "body aches." *Doc. 13-2 at 3*.

[17] On its face, this meant Stender would have been able to return to work on August 5, 2021.

[18] This date means Stender could "return to work" eight months *before* Dr. Beard found her to be unable to perform her job.

and cervical spondylosis" are the only "conditions or diagnoses" that rendered Stender unable to work on August 4. *Id.* Dr. Beard then checked a box indicating that Stender had "[m]oderate limitation of function[al] capacity" that rendered her "incapable of . . . administrative (sedentary) activity. . . (60-70%)." *Id.*

Dr. Beard's August 24 treatment notes do not reflect that he ordered any x-rays of Stender's spine or performed any range of motion procedures to evaluate the extent, if any, that her spondylosis *actually limited her ability to perform sedentary work*. Furthermore, his evaluation of her functional capacity is flatly contradicted by Dr. Martinez finding, on August 23, that Stender had "ROM - Within Functional Limits." *Doc. 13-2 at 18*.[19]

On September 21, 2021, Stender saw her cardiologist, Dr. Beg for a follow-up visit for her "dyspnea and palpitations." *Doc. 13-3 at 29-30*. During her appointment with Dr. Beg, *Stender did not mention anything about spondylosis or having any pain in her neck or lower back*. Dr. Beg noted that Stender "reports significant improvement in her symptoms especially dyspnea and palpitations. She has no new complaints today. She has lost 3 pounds with better eating and more physical activity in the last 1 month." *Id. at 30*. Dr. Beg's systems review noted

---

[19] The only medical records reflecting Stender had *any pain* in her cervical and lumbar spine are those related to her appointments with Dr. Martinez and Dr. Beard on August 23 and 24. *Nowhere else in her medical records* does Stender ever make any complaints about having pain and discomfort in her spine.

Stender was positive for "fatigue," "palpitations," and neurological weakness, but *negative* for "chest tightness," "shortness of breath," "chest pain," or "dizziness, seizures, syncope, light-headedness, and headaches." *Id. at 34*. Dr. Beg described Stender's "[p]ulmonary effort" as "normal" with "[n]o respiratory distress." *Id. at 35. She also found that Stender had: "Normal range of motion," overall, and, specifically, her cervical back had "[n]ormal range of motion and neck supple*." *Id*. Dr. Beg made these findings three days *after* Dr. Beard signed his Attending Physician's Statement reflecting that Stender's "lumbar and cervical spondylosis" limited her functional capacity to the point that she was unable to perform her "administrative (sedentary) activity." *Doc. 13-1 at 144*.

Finally, in Dr. Beg's assessment plan, she noted a CT of Stender's heart showed some calcification, but "no ischemia is present as a stress test is normal." *Doc. 13-3 at 36*. As to Stender's complaint of "shortness of breath," Dr. Beg found it was "[u]nlikely to be due to cardiac etiology with normal echocardiogram and normal stress test." *Id. at 35-36*.[20]

On October 22, 2021, Reliance Nurse Ana Bergonio reported that she had received and reviewed Stender's medical records but was "unable to support lack of work function from date of loss [August 4, 2021] onwards." *Doc. 13-1 at 41*. Nurse

---

[20] According to Stender's August 3 ER medical records, she takes albuterol to help control her asthma. *Doc. 13-1 at 171*.

Bergonio summarized those medical records as follows: (1) Stender was seen in the ER on August 3, 2021, but the results of her chest CT and ECG identified no heart problems, and she received medication for a urinary tract infection, acetaminophen for her headache, and medication for her chest congestion; (2) Stender saw Dr. Beard for complaints of neck and back pain on August 24, 2021, but the follow-up diagnostic tests were unremarkable; (3) Stender told Dr. Beard that she was seeing a chiropractor, "but no [chiropractor] records [are] seen on file;" and (4) Stender saw a cardiologist on September 21, 2021, and reported significant improvement for her prior complaints of dyspnea and palpitations. *Id*. Nurse Bergonio noted that "she would seek to "obtain [the] Discharge summary from [Stender's] ER visit, as well as Chiropractor actual office visit notes or if she has been seen by Orthopedics/spine specialist for Lumbar and Cervical spondylosis to assess for any functional impairment from [date of loss] onwards." *Id.*[21]

On November 5, 2021, Stender saw Dr. Beard again. *Doc. 13-2 at 179*. He noted that Stender:

> [was] getting weaker & more tired. Her C4 was elevated. She has fallen & fills up faster when she eats. Her hands & feet are numb. They do fluctuate in intensity. She has noticed occasional cramps. It is worse in the morning. She has had decreased dyspnea. She has a rheumatology appointment in 2 weeks.

---

[21] Stender never saw a "orthopedic/spine specialist" about the spondylosis that Dr. Beard diagnosed, on August 24, 2021, based solely on a physical examination.

*Id.* According to his "Review of Systems," Stender was positive for shortness of breath and weakness and numbness. *Id. at 181.* However, she has a "regular heart rate" that was "in rhythm." Because her "sensation is decreased to touch of her hands and feet," he referred her to a neurologist. *Id.* In his "Assessment/Plan," Dr. Beard noted: "Await referral. Keep appointment with rheumatologist. Return if symptoms worsen or fail to improve." *Id.*

On November 15, 2021, Stender suffered a sudden and acute stroke. A brain CT revealed diminished cerebral blood flow "in [her] right MCA territory." *Doc. 13-2 at 5.* She was admitted to Baptist Hospital in Conway, where she remained until November 23, 2021. *Doc. 13-4 at 61.* Discharge notes indicate that, during her stay in the hospital, neurologists monitored her, and they would continue to do so. *Id.*[22]

On November 23, 2021, Nurse Bergonio again reviewed Stender's medical records, which now contained the following new documents: (1) the medical records from Stender's August 3, 2021 visit to the ER; (2) Dr. Beard's November 5, 2021 notes; and (3) recent medical records associated with Stender's stroke on November 15, 2021. Nurse Bergonio concluded that Dr. Beard's August 24 medical notes were sufficient to support "lack of work function from 8/24/2021 to [short term disability]

---

[22] Stender was no longer "actively at work" when she suffered this stroke, which unquestionably was disabling. While it is not an issue in this ERISA action, Reliance notes in its Brief in Support of Cross-Motion for Judgment that, because Stender was not "actively at work" at the time of her stroke, she did not qualify as an "insured" or "eligible person" who was entitled to receive disability benefits under the policy. *See Doc. 13-1 at 7.*

max[imum] duration."[23] However, Nurse Bergonio stated she was "unable to support prior lack of work function from DOL [date of loss – August 4, 2021] since the records from the ER was [sic] unremarkable." *Doc. 13-1 at 42.*

In a letter dated December 2, 2021, Reliance denied Stender's short-term disability claim. Reliance noted that Stender ceased work on August 3, 2021, and claimed in her Proof of Loss Statement that she was unable to work beginning on and after August 4, 2021. Based on her ER medical records on August 3, 2021, and Dr. Beard's treatment notes on August 24, 2021, Reliance concluded she was not disabled as of August 4, 2021:

> As we previously indicated, in order to be eligible for benefits, there must be documentation of a physical or mental impairment, which substantiates that you meet your group policy's definition of disability as defined above. We were not provided with objective medical evidence that would support a disability as of August 4, 2021. Therefore, we have determined that the available information received does not support your disability.

---

[23] While Dr. Beard's August 24 notes assessed Stender with spondylosis, he did not order and review any x-rays or other imaging to determine the extent, if any, it would affect her "work function." He also did not perform a range of motion examination, which Dr. Beg performed on September 21 and found Stender generally had "normal range of motion" and, specifically, had "normal range of motion" in her cervical spine. *Doc. 13-2 at 35.* Without any objective testing to determine how limiting Stender's spondylosis might be on her ability to work, it is hard to see how Dr. Beard's August 24 medical notes were "sufficient" to support Stender's lack of work function on August 24, 2021. Finally, when Nurse Bergonio reached this conclusion, Reliance had not yet received Dr. Martinez's medical records in which he found, on August 23, 2021, Stender had "ROM within functional limits." *Doc. 13-2 at 18.*

Two independent neurologists were later retained by Reliance to review Stender's medical records. Both of them disagreed with Nurse Bergonio's conclusion that Stender had "lack of work function" on "8/24/2021." They both concluded Stender only lacked work function after her stroke on November 15. Of course, to prevail on her disability claim, Stender was required to prove she was unable to perform her job *on August 4, 2021*. This makes any conflict about whether she was unable to work on and after August 24 a moot point.

*Doc. 13-1 at 117.*

On December 3, 2021, Reliance sent Stender a second letter which was identical to the December 2, 2021 letter except that it added the following paragraph near the bottom of page two: "On November 17, 2021, we requested your medical records from your chiropractor Dr. Martinez, currently we have not received those records."[24] *Id. at 122.*

### B. Stender's Appeal

On December 29, 2021, Stender sent Reliance an email requesting that her claim be "reconsider[ed]," because it was "wrongly denied." *Doc. 13-2 at 16.* Her email also stated that Dr. Beard "is supposed to be sending in supplemental paperwork as well as Dr. Martinez finally sending in records of his treatments." *Id.*

On January 24, 2022, Nurse Kelly, a Reliance employee who was not involved in considering or denying her original claim, was assigned Stender's appeal. Nurse Kelly performed her own review of Stender's medical records to determine if she was unable to work on August 4, 2021. She concluded that, because Stender's stroke

---

[24] As of December 2, 2021, Dr. Martinez had not provided Reliance with Stender's medical records. Reliance initially requested those medical records from him on November 18, 2021, but received no response. *Doc. 13-2 at 26.* On December 29, 2021, Reliance sent a second request to Dr. Martinez. On January 3, 2022, Dr. Martinez finally provided Reliance with Stender's medical records on August 23 and 24, 2021. *Doc. 13-1 at 131.* Those records indicate, based on x-rays, that Stender's back pain, along with leg and hip pain, related to misalignment of the vertebra in her back, but her "ROM is within functional limits." *Doc. 13-2 at 17-23.* This explains why Reliance's December 2 letter does not mention Stender's visits to Dr. Martinez on August 23 and 24.

was "acute," it was unrelated to her "symptoms at the date of loss." She also noted that she believed the appropriate specialist to conduct an independent review of Stender's medical records would be a neurologist. *Doc. 13-1 at 43*.

After obtaining additional medical records covering the time Stender was hospitalized for her stroke (*Doc. 13-4 at 57-90*), Reliance retained Dr. Mostafa Farache, a board-certified neurologist, to make an independent review of Stender's medical records, and provide an opinion on whether she was unable to work on August 4, 2021. *Doc. 13-2 at 268-275*. As part of his review, Dr. Farache tried to speak with Dr. Beard, who did not respond to three of Dr. Farache's voicemails. *Id. at 269*. On February 2, 2022, someone named "Angela" returned Dr. Farache's phone calls to Dr. Beard and told him Dr. Beard "does not do peer to peer discussions and if we have any questions, we can fax them." *Id.*

In an "Advisory Report," dated February 3, 2022, Dr. Farache concluded that Stender had no impairing neurological diagnosis from August 4, 2021, through November 14, 2021, the day before her stroke: "The claimant had complaints prior to her stroke including generalized tiredness and weakness but no neurological diagnosis was made[,] and no impairing finding was documented so no impairment is supported prior to the stroke date [November 15, 2021]." *Id. at 272.* Dr. Farache also found that "From 8/4/2021 through 11/14/2021, the claimant had no impairing neurological diagnosis." *Id. at 271*.

16

As to Stender's pre-stroke condition, Dr. Farache summarized Dr. Beard's August 24, 2021 examination notes, as follows: (1) Stender "complained of feeling weak with neck and back pain," and "the plan was to do blood work for rheumatological conditions." *Doc. 13-4 at 43*; (2) Stender has cervical and lumbar spondylosis. *Id*.

Finally, Dr. Farache noted that he had reviewed and considered Dr. Beard's September 18, 2021 Attending Physician's Statement in which he listed Stender's "Diagnosis and Concurrent Conditions" as "lumbar and cervical spondylosis," and checked the "No" box adjacent to the question "Is patient able to perform his/her job?" *Doc. 13-1 at 144*.

Reliance asked Dr. Farache to answer seven questions in his Advisory Report. Question 3 asked him: "Based on your review of medical information and call(s), if completed, does the medical information support functional limitations sufficient to preclude working for the period of August 4, 2021 ongoing?" *Doc. 13-2 at 270*. Rather than providing a direct answer to this important question, Dr. Farache stated: "From 8/4/2021 through 11/14/2021, the claimant [Stender] had no impairing neurological diagnosis." *Id. at 271*. This answer did *not* specifically address whether Stender had "functional limitations sufficient to preclude [her] working for the period of August 4, 2021 ongoing."

Reliance decided to have Dr. Farache provide another Advisory Report based on his review of additional records related to Stender's post-stroke progression. He was again instructed to answer a series of specific questions after he completed his review of Stender's medical information. The new medical records Dr. Farache reviewed were: (1) a history and physical performed by Dr. Courtney Bundrick, an Internal Medicine specialist, on 11/15/2021; (2) Stender's hospital discharge summary dated 11/23/2021; (3) a history and physical related to Stender's admission to rehabilitation; and (4) Stender's rehabilitation discharge summary dated December 10, 2021. *Doc. 13-2 at 320-321.*

In his second Advisory Report, dated February 22, 2022, Reliance asked Dr. Farache to answer, in what was now "Question 2," essentially the *same question* he gave an unresponsive answer to in his February 3, 2022 Advisory Report: "Based on your review of medical information and call(s), if completed, does the additional medical information presented support functional limitations sufficient to preclude working for the period of 08/04/2021 ongoing?" *Id. at 321.* This question *again* required Dr. Farache to state whether anything in Stender's medical records (pre-stroke *and* post-stroke) would support *functional limitations* sufficient to preclude her from working "for the period of *08/04/2021* ongoing?" For a second time, Dr. Farache gave an answer that did not specifically address whether Stender had "functional limitations sufficient to preclude work for the period of 08/04/2021

ongoing:" "As noted on previous review [presumably his February 3, 2022 Advisory Report] the most updated records indicate the claimant was not yet functionally independent with ADLs [activities of daily living] and hence she was unable to sustain any gainful employment." *Id.*

Dr. Farache's inability to provide a responsive and comprehensive answer to that question appears to have led Reliance to hire a second board-certified neurologist, Dr. Norman Burns, to review Stender's medical records, and provide an Advisory Report that comprehensively answered the question which had so eluded Dr. Farache.[25]

In his Advisory Report, dated March 7, 2022, Dr. Burns reviewed Stender's medical records and concluded in his "Assessment/Rationale" that, from a neurological standpoint, the "medical information provided does not support impairment for the time period of 08/04/2021 to 11/14/2021." *Doc. 13-4 at 167.* Dr.

---

[25] A Reliance appeal analyst keenly noted the problem Dr. Farache was having in an email to one of her co-workers: "I don't feel as though the questions posed were answered adequately [by Dr. Farache]. We are trying to assess if she [Stender] was having symptoms from August to November or did she have an impairment in work function prior to the stroke for the dates of August 4, 2021 ongoing." *Doc. 13-1 at 59.* This email makes it clear that Reliance is seeking a responsive answer to this question to insure there is nothing in Stender's post-stroke medical records that might *support* her being disabled, on and after August 4, based on functional limitations related to some nascent cerebral issue. This was important because Stender's scant medical records from her August 3 visit to the ER, and her appointments with Drs. Martinez and Beard, on August 23 and 24, were a clear and obvious *dead end* that could not possibly support a disability claim based on functional limitations related to spondylosis. Thus, in hiring Dr. Burns, Reliance was trying to insure it obtained a responsive answer to an important question that *might support* Stender's claim she was unable to perform her job on August 4 based on something other than spondylosis.

Burns further concluded that: "For the time the claimant was hospitalized on 11/15/2021 until discharge from therapy at Heritage Living on January 6, 2022, the claimant would be considered totally impaired and unable to work in any capacity." *Id.*

In response to "Question 2," Dr. Burns gave a direct, clear, and comprehensive answer: "The medical information does not support [Stender having] functional limitations sufficient to preclude working for the period of 08/04/2021 to 11/14/2021. Functional impairment is not supported during this timeframe. The claimant suffered a right MCA stroke and secondary hemorrhagic transformation on 11/15/2021. Neurological impairment is supported from 11/15/2021 and ongoing." *Id. at 165*.

In a letter dated March 16, 2022, Reliance advised Stender that its "Appeals Department" had conducted an independent review of her claim and concluded that the Claims Department's original decision to deny benefits was appropriate." *Doc. 13-1 at 130*. In explaining its decision, Reliance noted that, under the policy, "disabled" is defined to mean: "(1) unable to do the material duties of his/her job; *and* (2) not doing any work for payment; *and* (3) under the regular care of a physician." *Doc. 13-1 at 7*. Because Stender's last day of work was August 3, 2021, and her Proof of Loss Statement specified she was "unable to work" on and after August 4, 2021, Reliance explained that her disability claim hinged on medical

evidence documenting that *she lacked the ability to work on and after that date.* It then identified the relevant medical records and explained that two members of its staff and two independent reviewing neurologists had reviewed those documents and found they do not support functional limitations sufficient to establish she was unable to work on and after August 4, 2021.

Finally, Reliance advised Stender "our claim decision is now final as you have exhausted any remedies available to you under the terms of the policy." *Id. at 133.*

## III.    STANDARD OF REVIEW

The ERISA plan under which Stender was covered gave Reliance the "discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." *Doc. 13-1 at 13*. In reviewing a plan administrator's exercise of this "discretionary authority," courts must affirm decisions of the plan administrator unless those decisions rise to the level of an abuse of discretion. *See McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 792 (8th Cir. 2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). In an abuse-of-discretion review, a court must find the plan administrator's decision was unreasonable or unsupported by substantial evidence; thereby making the decision "arbitrary and capricious." *Shafer v. Zimmerman Transfer, Inc.*, 70 F.4th 471, 476 (8th Cir. 2023) (citing *Roebuck v. USAble Life*, 992 F.3d 732, 740 (8th Cir.

2021); *Miller v. Hartford Life & Accident Ins.*, 944 F.3d 1006, 1010-11 (8th Cir. 2019)). [26]

Stender argues that Reliance had a "conflict of interest" and committed "numerous procedural irregularities" which weigh against upholding its decision to deny Stender's claim under the abuse-of-discretion standard. In *McIntyre v. Reliance Standard Life Insurance Co.*, 972 F.3d 955 (8th Cir. 2020) (hereinafter *McIntyre I*), the Court held that, while a conflict of interest does *not* trigger *de novo* review of a plan administrator's rejection of a disability claim, it is "a factor [that can be considered] in determining whether [a plan administrator] abused its discretion." *Id.* at 963 (citing *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105, 115 (2008)).[27]

*McIntyre I* also discussed how a "procedural irregularity" should be evaluated under the abuse-of-discretion standard. It noted that even an "ostensibly serious procedural irregularity" is not sufficient to trigger *de novo* review of a plan administrator's decision. However, a court may "tak[e] into consideration the . . . procedural irregularity," and give it appropriate weight in deciding if there was an

---

[26] Under the policy language, counsel for Stender concedes that: "Given the unmistakable holding in *McIntyre* [*I*], the applicable standard of review in this case is abuse of discretion." *Doc. 20 at 4.*

[27] In *Glenn*, however, the Court recognized that such a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.

abuse of discretion by the plan administrator. *Id.* (quoting *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (*abrogated in part by Glenn*, 554 U.S. at 115-16)).[28]

Finally, in *McIntyre v. Reliance Standard Life Insurance Co.*, 73 F.4th 993 (8th Cir. 2023) (hereinafter *McIntyre II*), the Court recognized that procedural irregularities which create "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim," should be weighed heavily against the plan administrator, while "'[m]inor procedural defects . . . do not carry significant weight.'" *Id.* at 1002 (quoting *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996); *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 830 (8th Cir. 2014)).

## IV.    RELIANCE'S CONFLICT OF INTEREST AND ITS ALLEGED INVOLVEMENT IN PROCEDURAL IRREGULARITIES

### A. Conflict of Interest

Where a plan administrator both determines the disability claim and pays the claim, there is a conflict of interest, which under appropriate circumstances, may be assigned weight in deciding if the denial of claim was an "abuse of discretion." *See Roebuck*, 992 F.3d at 737 (citing *Glenn*, 554 U.S. at 108). However, such

---

[28] *See also Roebuck*, 992 F.3d at 738 ("after briefing closed in this appeal, we held [in *McIntyre I*] procedural irregularities do not trigger de novo review") (citing *McIntyre I*, 972 F.3d at 963); *Shafer*, 70 F.4th at 476 ("standard of review does not change even if the plan administrator has a conflict of interest, but we consider it when determining whether the plan administrator abused its discretion"); *Ruessler v. Boilermaker-Blacksmith Nat'l Pension Tr. Bd. of Trustees*, 64 F.4th 951, 958 (8th Cir. 2023) ("any conflict of interest is just a factor to be weighed in the abuse of discretion analysis") (citations omitted).

conflicts are only entitled to considerable weight if "the insurer's claims review process was tainted by bias; . . . the medical professionals who reviewed the claim for [disability] benefits were employed by the insurer; their compensation was tied to their findings; or the insurer acted as little more than a rubberstamp for favorable medical opinions." *Boyd v. ConAgra Foods, Inc.,* 879 F.3d 314, 320–21 (8th Cir. 2018).

While Reliance's dual role of deciding and paying disability claims created a conflict of interest, Stender has offered nothing suggesting its decision to deny her claim was colored by bias, avarice, or other improper motives.[29] Furthermore, because Reliance took affirmative steps to reduce the potential for such a conflict of interest interfering with its decision, Stender's task of showing it had a conflict of interest becomes even more difficult.

For example, after Stender appealed, Reliance assigned her case to employees in its appeals department who were *not* involved in the claims department's first level of review. Reliance also hired two independent neurologists to evaluate Stender's claim. *See Roehr v. Sun Life Assurance Co. of Canada*, 21 F.4th 519, 525 (8th Cir. 2021) (declining to apply a *de novo* standard of standard of review where

---

[29] Stender speculates that Reliance may have denied her short-term disability claim to avoid later having to pay long-term benefits. In *Jones v. Aetna Life Ins. Co.,* 856 F.3d 541, 549 (8th Cir. 2017), the Court held that, even where there is a conflict with respect to the denial of short-term benefits as a proxy for long-term benefits, a claimant must still show that the plan administrator's decision was arbitrary and capricious.

an insurer consulted with two independent physicians, one independent physician reached out to the treating physician, and, on appeal, the insurer assigned the file to a consultant with no prior involvement).

Finally, in *Boyer v. Schneider Elec. Holdings, Inc*., 993 F.3d 578, 581 (8th Cir.), cert. denied, 211 L. Ed. 2d 353 (2021), the Court noted that a "conflict of interest may be a factor in the review—a tie, for example, might be resolved against a conflicted administrator." (citing *Glenn*, 554 U.S. at 117). Here, overwhelming medical evidence supported Reliance's decision to deny Stender's claim, which makes this far from a "close case," much less a "tie." Accordingly, Reliance's conflict of interest is entitled to no real consideration in deciding if it abused its discretion.[30]

## B. Procedural Irregularities

Stender also contends there were "numerous procedural irregularities" in Reliance's review process that should be considered in determining if Reliance abused its discretion. These alleged procedural irregularities include the following: (1) Reliance did not obtain a complete set of Stender's ER medical records; (2) Reliance did not retain an independent medical specialist in the field of "family

---

[30] The Court in *Glenn* recognized that, in cases like this one, where the medical evidence provides little, if any, support for the claim, a plan administrator's conflict of interest may reach "the vanishing point." *Glenn*, 554 U.S. at 117.

medicine, chiropractic, or orthopedics" to evaluate the functional limitations related to her medical condition on and after August 4, 2021; and (3) Reliance hired Dr. Norman Burns, a second neurologist, to review Stender's medical records and formulate a "new basis" for rejecting her claim on appeal.

Each of these criticisms of the way Reliance handled Stender's claim are without merit and are not supported by the facts. Accordingly, they are entitled to no weight in deciding if Reliance abused its discretion in deciding her claim.

### 1. Reliance's Alleged Failure to Obtain All of Stender's ER Medical Records

Under the policy, it was Stender's obligation to provide Reliance with all of the medical records that entitled her to disability benefits: "When [Reliance] receive[s] written proof of loss, we will pay any benefits due." *Doc. 13-1 at 13*. *Sahulka v. Lucent Techs., Inc.*, 206 F.3d 763, 769 (8th Cir. 2000) ("When a plan places the burden on the claimant to provide necessary information, the claimant cannot shift the burden of investigation to the plan administrator."); *Jackson v. Wal-Mart Stores, Inc. Associates' Health and Welfare Plan*, 92 F.Supp.2d 882, 889 (W.D. Ark. 2000).

Stender could have copied all of her ER medical records and then provided them to Reliance. Instead, she decided to take *screenshots* of her ER medical records, and then forward them to Reliance. *Doc. 13-1 at 170-183 and Doc. 13-2 at 3*. While Stender claims the information at the bottom of some of her screenshots is "cut off,"

it appears the "cut off" lines appear at the top of the next page. Furthermore, Stender fails to specifically identify and explain any of the allegedly "missing information" and how it would have had *any substantive impact* on whether she was unable to work on and after August 4—especially when *everything else* in her ER screenshots supports the contrary proposition. Having created this problem by sending Reliance screenshots of her ER records, Stender is in no position to argue that Reliance should be blamed for an alleged "procedural irregularity" *she created*. Finally, while arguing around the margin about the allegedly missing information from the screenshots she took of her ER records, she ignores the undisputed fact that: (1) the CT of her heart and her ECG test did not detect any serious problems with her heart; and (2) her ER exam was described as "unremarkable." *Doc. 13-2 at 3*. As a result, Stender was discharged from the ER and returned home with medication to treat her suspected UTI; her headache; her chest congestion; and her asthma. *Id*.

Finally, before making its final decision on her claim, Reliance sent Stender several emails requesting her to provide all of the medical records she was relying on to support being unable to work on and after August 4, 2021. *Doc 13-1  at 86, 93, 94, 95, 96.* For example, on January 4, 2021, Reliance appeals analyst Diana McKenney wrote Stender and explained "that while we attempt to request this [medical] information on your behalf, ultimately it is your responsibility to provide us with any information you wish to have considered during the course of this appeal

review." *Id. at 124-125*. On February 8, 2021, McKenney again reminded Stender of her responsibility to provide Reliance with evidence she had a short-term disability on and after August 4, 2021. *Id. at 129*. Under the plan, Stender was responsible for providing Reliance with all of the medical records necessary to support her claim for benefits. This leaves her in no position to argue Reliance engaged in any procedural irregularities related to its review of her ER medical records.

### 2. Reliance's Alleged Failure to Select the Correct "Specialist" to Review Stender's Medical Records

On appeal, an ERISA plan administrator is allowed to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). Reliance did so in this case, by retaining two independent neurologists. Nevertheless, Stender contends that, because these were not the *right specialty*, there was a procedural irregularity in Reliance's decision to deny her claim.

In *Cooper v. Metro. Life Ins. Co.,* 862 F.3d 654, 662 (8th Cir. 2017), the Court held that the proper inquiry, in evaluating the fairness of a plan administrator's decision to retain an independent medical specialist, is whether the administrator substantially complied with its obligation to give "the claimant 'a full and fair review of her claim.'" *Id.* (quoting *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1038 (8th Cir. 2016)).

Stender contends that, in considering her appeal, Reliance "focused entirely on the November 15 stroke," and "abandoned any further consideration of the basis of the original denial; *i.e.*, whether [Stender's] neck and back pain existed during the ER visit sufficient to connect that date to the cervical and lumbar spondylosis treated by Dr. Beard on 8/24[.]" *Doc. 15 at 19*. According to Stender, Reliance should have hired an "orthopedic, chiropractic, or even family medicine practitioner" to review her medical records to determine if her lumbar and cervical spondylosis, on August 4, 2021, created functional limitations that prevented her from working.

As previously explained, nothing in Dr Beard's August 24 medical notes comes close to establishing that Stender's spondylosis rendered her unable to perform work, *three weeks earlier*, on August 4, 2021. Furthermore, her August 3 ER records make it clear that she only complained about "body aches" (*Doc. 13-2 at 3*). Nowhere in her ER records does she ever complain about "neck or back pain" or otherwise suggest she is having any pain in her spine.

When she saw Dr. Martinez and Dr. Beard on August 23 and 24, she was *not* complaining about "body aches"—she was complaining about intense pain in and around the joints in her neck and back. She reported this pain was 9 on a 10 scale on August 23 and 7 or 8 on a 10 scale on August 24. Yet, Stender failed to mention anything about neck or back pain to Dr. Beg when she saw her on September 21 (*Doc. 13-3 at 29-37*) or when she saw Dr. Beard on November 5, 2021 (*Doc. 13-2*

29

*at 179-184*). In fact, the only time Stender ever sought medical treatment for her neck and back pain was on August 23 and 24. No physician, regardless of their medical specialty, could look at her medical records and conclude that: (1) she had spondylosis, *on August 3*, (which was causing her so little discomfort that she failed to mention it to ER medical providers); *and* (2) it rendered her unable to work on or after August 4. Even if her subjective complaints of sudden and severe back pain from spondylosis, on August 23 and 24, are taken as true, it would only mean she may have been unable to work from August 23 to sometime *before* September 21, when she saw Dr. Beg and mentioned nothing of any neck or back pain and was determined to have normal range of motion.

*Nothing* in Stender's medical records comes close to establishing that, on August 3, 2021, she had spondylosis of the neck and back that caused her to be unable to work on and after August 4. This argument is a hopeless medical dead end that would have been recognized by an orthopedist or any other recognized specialist who reviewed her medical records.

Reliance fairly and reasonably decided to hire two independent neurologists to focus on whether there might be something in Stender's post-stroke medical records that might reveal some latent vascular or cerebral issue that was present on August 3 *and that rendered her unable to work on and after August 4*. Dr. Farache and Dr. Burns both concluded there was nothing in Stender's pre-stroke and post-

stroke medical records, when evaluated from a neurological perspective, that would support her being unable to work prior to November 15, 2021.

Stender also suggests that the emergency room testing on August 3, 2021 revealed "symptoms" that were related to her as yet "undiagnosed condition":

> Reliance overlooked the very obvious fact that Stender was treated in the ER on August 3, 2021 for palpitations and heart issues (abnormal ECG) as well as muscle pain, which, in hindsight given her confirmed stroke on November 15, 2021, certainly all appear to be consistent with symptoms from *the <u>same</u> underlying yet undiagnosed condition*. (emphasis added).

Nothing in the ER medical records, including the results of the CT of her heart and the ECG, suggested she was having any symptoms of a stroke or that she had any test results suggesting she might be on the verge of a stroke. After reviewing the results of the CT scan of her heart and the ECG, her ER physicians discharged her from the ER to return home, with the notations "exam was unremarkable" and "the workup" was "nondiagnostic." *Doc. 13-2 at 3*.[31] Stender's own cardiologist, Dr. Beg, saw her on September 21, 2021, and evaluated her heart function to be normal and stable. *Doc. 13-3 at 29-37*.

Nothing in Stender's August 3 ER records, Dr. Martinez's chiropractor records from August 23 and 24, Dr. Beard's medical notes of his examination of her

---

[31] Neither the ER physicians nor Dr. Jones saw anything that prevented her from being discharged from the ER, and no follow-up was recommended. *Doc. 13-2 at 3.*

on August 24, or Dr. Beg's medical notes from examining Stender on September 21 suggest she had any vascular or cerebral issues that might have limited her functional ability to perform work on and after August 4, 2021.

Accordingly, there are no facts to support Stender's claim that Reliance "overlooked" her having been "treated in the ER on August 3, 2021, for palpitations and heart issues . . .." What Stender overlooks is that there was *nothing* about her examination and test results on August 3 which suggest she had *any* functional limitation that made her unable to work on and after August 4. As a result, there were no "procedural irregularities" associated with Reliance's decision to have two independent neurologists review her medical records.

### 3.  Reliance Did Not Rely On a "New Medical Basis" to Deny Stender's Claim On Appeal

Stender argues that Reliance "overlook[ed] the orthopedic/chiropractic focus that was the basis of the original denial [of her short-term disability claim] [and focused on] the neurologic aspect of Stender's stoke that occurred after benefits would have already been exhausted." *Doc. 15 at 12.* Nothing in the record supports this argument.

Reliance's first denial letter to Stender states the following:

As we previously indicated, in order to be eligible for benefits, there must be documentation of a physical or mental impairment, which substantiates that you meet your group policy's definition of disability as defined above. We were not provided with objective medical evidence that would support a disability as of August 4, 2021.

Therefore, we have determined that the available information received does not support your disability.

*Doc. 13-1 at 117.*

In its second denial letter, Reliance reiterated the *same ground* for denying her disability claim:

> As explained above, in order to be eligible for benefits, there must be documentation of a physical or a mental health impairment, which substantiates that you meet the group policy's definition of Disabled, as defined above. In your current situation, the policy requires that you be Disabled from performing the material duties of your job from the date of loss, , August 4, 2021. . . . [t]herefore, based on the totality of information, we have found that the decision to deny benefits was appropriate, as you were not considered Disabled, as defined in the policy as of August 4, 2021 and benefits are denied.

*Id. at 132.*

Those two letters make it clear that Reliance denied Stender's claim because she failed to establish that she was unable to work on August 4, 2021. While Reliance's second letter went into greater detail in explaining why Stender's post-stroke medical records did not support her being unable to work on August 4, 2021, it clearly was *not* a new medical basis for denying her claim.

Accordingly, because Reliance did not rely on a "new medical basis" to deny Stender's claim on appeal, it does not constitute a "procedural irregularity" that should be considered by the Court in deciding if Reliance abused its discretion in denying Stender's claim.

## V.   RELIANCE'S INTERPRETATION OF THE POLICY WAS NEITHER FLAWED NOR UNREASONABLE AND INVOLVED NO ABUSE OF ITS DISCRETION

In *Ruessler*, 64 F.4th at 959, the Court identified the following factors that should be considered in deciding if a plan administrator's interpretation of an ERISA policy is reasonable: (1) Is the interpretation consistent with the goals of the Plan; (2) Does it render any language in the Plan meaningless or internally inconsistent; (3) Does it conflict with the substantive or procedural requirements of the ERISA statute; (4) Does it interpret the words at issue consistently; and (5) Is the interpretation contrary to the clear language of the Plan. *Id.*

Stender argues that Reliance's interpretation of the ERISA plan: (1) is contrary to its clear language; (2) renders its language meaningless and internally inconsistent; (3) is contrary to the goals of the plan; and (4) is inconsistent with Reliance's previous interpretations of the plan.

Stender contends that Reliance focused on "whether she had a sickness on August 3 that justified her taking off work [on August 4, 2021]." *Doc. 15 at 17.* To the contrary, Reliance focused on whether Stender: (1) met the definition of "disabled" ("unable to do the material duties of her job") on August 4, (*Doc. 13-1 at 7*); and (2) had provided "written proof of loss" to allow it to "pay any benefits due" (*Id.*). In its denial letters, Reliance explained in detail the reasons why Stender had not established she was unable to work on August 4, 2021. *Doc. 13-1 at 121-123,*

34

*130-133.* Reliance's interpretation of the relevant policy provisions was reasonable, and nothing about that interpretation rendered any of the language in the plan meaningless or internally inconsistent.

Finally, Stender makes a conclusory argument that Reliance's interpretation of the policy was inconsistent with the goals of the plan. To the contrary, Reliance's interpretation of the policy provisions was consistent with the plan's goal of insuring that claimants, who apply for benefits *and* who can prove they were unable to perform work on the specified onset date, receive the benefits they are due.

Reliance left no stone unturned in its review of Stender's medical records supporting her claim that, on and after August 4, 2021, she was unable to work and entitled to receive disability benefits. Its decision to deny her claim was fair and reasonable, and supported by substantial medical evidence.

## VI.   STENDER'S CLAIM FOR EQUITABLE RELIEF

Finally, Stender argues that she is entitled to "equitable relief" based on Reliance's breach of its fiduciary duties. *See* 29 U.S.C. § 1132(a)(3); *Silva v. Metropolitan Life Insurance Co.*, 762 F.3d 711, 717 (8th Cir. 2014).

In *Ruessler*, 64 F.4th at 961, the Court recognized that "fiduciaries [must] 'discharge [their] duties . . . with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use' . . . [and] [t]hat requirement is further

supplemented by the common law of trusts, including the duty of prudence and the duty of loyalty." However, because Reliance's decision to deny her claim was fair and reasonable, there is simply *nothing* in the record to support Stender's claim that Reliance breached any of the fiduciary duties it owed to Stender. Accordingly, Stender is not entitled to any equitable relief under 29 U.S.C. § 1132(a)(3).

## VII.  CONCLUSION

Stender made an unwise decision to stop working, and to select August 4, 2021 as the "first day [she was] unable to work" in the Proof of Loss Statement she submitted to Reliance seeking short-term disability benefits. *Doc. 13-1 at 138*. The medical records from her ER visit on August 3, her appointments with Drs. Martinez and Beard on August 23 and 24, and her appointment with Dr. Beg on September 21 makes it clear she was *not* unable to perform her job on and after August 4, 2021. It was only after Stender suffered a sudden and acute stroke, on November 15, 2021, that she became disabled.

If Stender had continued to perform her job, on and after August 4, she almost certainly would have met the definition of "disabled" at the time of her stroke, which would have entitled her to receive long-term disability benefits from Reliance. According to Stender, this is the aspect of the case which makes Reliance's decision harsh and inequitable. However, the emails and notes of Reliance employees reflect this was not the outcome Reliance wanted—it was, instead, a decision it was required

to make based on the medical evidence and the plain language of the policy. While it was a hard decision, Reliance clearly did not abuse its discretion in denying Stender's short-term disability claim. Accordingly, Reliance's Cross-Motion for Judgment on the Administrative Record should be granted.

IT IS THEREFORE RECOMMENDED THAT:

1. Stender's Motion for Judgment on the Pleadings (*Doc. 14*) be DENIED.

2. Reliance's Cross-Motion for Judgment on the Administrative Record (*Doc. 16*) be GRANTED.

3. Judgment be entered accordingly.

DATED this 17th day of August, 2023.

_____
UNITED STATES MAGISTRATE JUDGE